# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**GREAT-WEST LIFE & ANNUITY INSURANCE COMPANY,**

                        **Plaintiff,**

        **-vs-**

**RISER FOODS, INC.,**

                        **Defendant.**

**CASE NO. 1:18-CV-01330**

**JUDGE PAMELA A. BARKER**

**MEMORANDUM OF OPINION AND ORDER**

This matter comes before the Court upon the parties' cross-motions for summary judgment. Defendant Riser Foods, Inc. ("Riser")[1] filed a Motion for Summary Judgment on July 29, 2019. (Doc. No. 44.) Plaintiff Great-West Life & Annuity Insurance Company ("Great-West") filed a brief in opposition to Riser's Motion for Summary Judgment on September 12, 2019, to which Riser replied on September 26, 2019. (Doc. Nos. 57, 58.)

Great-West filed its own Motion for Summary Judgment on August 12, 2019. (Doc. No. 49.) Riser filed a brief in opposition to Great-West's Motion for Summary Judgment on September 12, 2019, to which Great-West replied on September 26, 2019. (Doc. Nos. 55, 60.)

For the following reasons, Riser's Motion for Summary Judgment (Doc. No. 44) is GRANTED, and Great-West's Motion for Summary Judgment (Doc. No. 49) is DENIED.

---

[1] Riser has indicated that the proper party to this suit is Riser Foods Company, not Riser Foods, Inc. (Doc. No. 44 at 1 n.1.) However, Riser has not sought dismissal on this basis, and neither party has moved for a substitution of party.

## I. Background

### a. Factual Background

On August 13, 1992, Bear Creek Properties, Co., Limited Partnership ("Bear Creek"), as landlord, entered into a lease (the "Lease") with First National Supermarkets, Inc. ("First National"), as tenant, with respect to certain property in the Meadowbrook Market Square II Shopping Center (the "Meadowbrook Shopping Center") in Bedford, Ohio. (Doc. No. 46-1 at 1.) In 2006, Riser, a subsidiary of Giant Eagle, Inc., assumed the Lease from Tops Markets, LLC (after Tops Markets, LLC had acquired it from First National). (*See* Doc. No. 46-19.) Great-West acquired Bear Creek's rights under the Lease in 2017. (Doc. No. 46-23.)[2]

The Lease defines the specific leased premises, labeled as the "Demised Premises," and provides that "[t]he Demised Premises are a part of a parcel of land located at Rockside and Northfield Roads, as shown on the Site Plan, described on the attached Exhibit B (the 'Land')." (Doc. No. 46-1 at 1.) Exhibit B to the Lease provides a metes and bounds description of property and is labeled as "Legal Description of Shopping Center." (*Id.* at Ex. B.) A translation of this legal description shows that it encompasses both the Demised Premises and the property on which the Target building at the heart of this dispute was located. (Doc. No. 46-2.) The Lease goes on to define the "Shopping Center" as "[t]he Land and the buildings and improvements now or hereafter located on the Land." (Doc. No. 46-1 at 1.)

---

[2] For ease of reference, the Court uses "Landlord" throughout the rest of the opinion to refer collectively to Bear Creek, BCD Bedford, LLC ("BCD Bedford"), and Goudreau Management Corporation ("GCM"). BCD Bedford also owned property in the Meadowbrook Shopping Center and shared common ownership with Bear Creek. (Doc. No. 57 at 3.) GCM was the property management company and agent for both Bear Creek and BCD Bedford. (*Id.*)

The Lease also provides that the "Landlord intends to develop the Shopping Center in three (3) separate phases which are respectively designated as (a) the 'Phase I Shopping Center Development Area' (including 'Proposed Future Out Lot Area East' and sometimes hereinafter referred to as 'Phase I', (b) the 'Phase II Proposed Future Development Area' and sometimes hereinafter referred to as 'Phase II' and (c) the 'Phase III Proposed Future Out Lot Development Area' and sometimes hereinafter referred to as 'Phase III' and which are respectively identified as such on the Site Plan." (*Id.*) The Site Plan referred to is identified by the Lease as Exhibit A. (*Id.*) Exhibit A provides the same legal property description as Exhibit B. (*Id.* at Exs. A, B.) In addition, Exhibits A-1, A-2, and A-3 to the Lease provide additional legal descriptions of property and are labeled Phase I, Phase II, and Phase III, respectively. (*Id.* at Exs. A-1, A-2, A-3.) A translation of the legal descriptions in Exhibits A-1, A-2, and A-3 show that each phase correlates to a different portion of the property delineated in both Exhibits A and B. (Doc. No. 46-2.) The Demised Premises were located in Phase I, and the Target building was located in Phase II. (*Id.*) The Lease also indicates that "[t]he Shopping Center is shown on the Site Plan and on the survey dated August 6, 1992 attached as Exhibit B-1." (Doc. No. 46-1 at 1.) However, Exhibit B-1 to the Lease is missing.

When Riser assumed the Lease in 2006, it decided not to open a Giant Eagle location on the property after conducting market research and learning that a Walmart Supercenter would soon open nearby. (Doc. No. 46-4 at 20:13-21:7.) Instead, Riser used the building to store used Giant Eagle equipment from other stores. (*Id.* at 31:8-25.) Riser continued, however, to pay rent, common area maintenance fees, and property taxes under the Lease until the incident at issue. (Doc. No. 46-7 at 34:7-16.)

On May 28, 2015, lightning struck the Target building in the Meadowbrook Shopping Center, causing the roof to collapse inward.  (Doc. No. 46-8 at 1.)  According to Great-West, approximately two weeks later, a second lightning strike hit the Target store causing further damage.  (Doc. No. 46-7 at 37:12-38:3.)  Not only did the roof partially collapse, but the sprinkler system burst and flooded the premises.  (*Id.* at 38:4-39:13.)  At that time, Target's lease of the damaged property was set to expire in approximately two months, and Target negotiated a settlement with Landlord in which it paid $800,000 to terminate the remainder of the lease.  (*See* Doc. No. 46-14.)

Shortly thereafter, after having structural engineers view the site, Landlord determined that the amount of structural damage to the exterior of the building, as well as to the interior of the building from heavy rains and water from the broken sprinkler system, necessitated demolition of the Target building.  (Doc. No. 46-8 at 1.)  Consequently, Landlord decided to raze the Target building, and demolition was completed at the end of July 2015.  (*Id.*)[3]

On August 31, 2015, Landlord sent a letter to Riser notifying it of a recalculation of costs related to common area maintenance and property taxes due to the razing of the Target store.  (*Id.*)  The letter explained that the reason for the recalculation was the May 28, 2015 lightning strike, which resulted in the demolition of the Target.  (*Id.*)  Based on the loss of the Target building, which was 118,750 square feet, Riser's pro-rata share of costs related to common area maintenance and property taxes increased from 29.71 percent to 57.11 percent and from 28.24 percent to 51.92 percent, respectively.  (*Id.*)  Riser asserts this was the first time it learned of the lightning strike and demolition of the Target building.  (Doc. No. 45 at 6.)

---

[3] Riser asserts this was the earliest that demolition could have been completed, and that it may have continued into August 2015.  (*See* Doc. No. 45 at 5.)

In response, on September 16, 2015, Riser mailed a letter to Landlord explaining that based on the "demolition and destruction of the largest of the Shopping Center buildings at the end of July . . . [Riser] exercises its right to terminate the Lease pursuant to Section 15.6 of the Lease." (Doc. No. 46-19.) Section 15.6 of the Lease provides:

> Notwithstanding anything to the contrary in this Lease contained, if Tenant's Building or the Shopping Center buildings are damaged or destroyed (a) during the last three (3) years of the then existent term of this Lease to an extent equal to at least thirty percent (30%) of their replacement cost during the third last year, twenty percent (20%) of their replacement cost during the second last year and ten percent (10%) of their replacement cost during the last year, then either Landlord or Tenant may terminate this Lease as of the date of the occurrence of such damage or destruction by notice to the other party within sixty (60) days after the occurrence of such damage or destruction . . . .

(Doc. No. 46-1 at 36.)

Landlord objected to the termination and refused to transfer utilities, taxes, insurance, or the alarm system back to Landlord despite Riser's repeated efforts. (*See, e.g.*, Doc. No. 46-21.) After Landlord defaulted on its loans with Great-West, Great-West reiterated Landlord's objection to the termination and informed Riser that "Lender will consider Giant Eagle and its predecessor responsible if a casualty occurs and the casualty is not covered by Giant Eagle's property insurance." (Doc. No. 46-22.) As a result, while Riser refused to make additional rental payments, Riser continued to pay operating costs for the premises, such as insurance and utilities, reasoning that "it was best to be conservative to prevent casualty to our building should something happen because shutting off the utilities would have terminated the alarm system, it would have terminated the fire suppression system, and we wanted to be conservative because the landlord, again, was unresponsive, and there was this period of time where, you know, it wasn't clear who was managing the property,

is it the receiver, lender, et cetera, and nobody was taking responsibility for the utilities." (Doc. No. 46-4 at 58:8-59:2.)

After filing a foreclosure action against Landlord, Great-West eventually received an assignment of Landlord's breach of the Lease action by court order on October 27, 2017. (Doc. No. 46-23.)

### b. Procedural History

On June 11, 2018, Great-West filed suit in this Court against Riser for breach of the Lease and against Koninklijke Ahold N.V. ("Ahold") for breach of a guaranty related to the Lease. (Doc. No. 1.) Subsequently, Great-West dismissed Ahold from the action and filed an Amended Complaint against Riser, setting forth a single cause of action for breach of contract based on Riser's allegedly improper early termination of the Lease. (Doc. Nos. 27, 33.)

Riser and Great-West filed Motions for Summary Judgment on July 29, 2019 and August 12, 2019, respectively. (Doc. Nos. 44, 49.) Both Motions have been fully briefed and are ripe for consideration. (Doc. Nos. 45, 50, 55, 57, 58, 60.)

## II. Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006). "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law."  *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party."  *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018).  In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact."  *Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 508 (6th Cir. 2014).  The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact."  *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 764 (6th Cir. 2008).  "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'"  *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial."  *Ask Chems.*, 593 F. App'x at 508-09.  "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'"  *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

## III.    Analysis

Generally, in Ohio, to prove a breach of contract claim, a plaintiff must demonstrate that: "(1) a contract existed, (2) the plaintiff fulfilled his obligations, (3) the defendant failed to fulfill his

obligations, and (4) damages resulted from this failure." *Second Calvary Church of God in Christ v. Chomet*, No. 07CA009186, 2008 WL 834434, at *2 (Ohio Ct. App. 9th Dist. Mar. 31, 2008).[4]

"Under Ohio law, the interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008). It is the role of the court to discern the intent of the parties, which is "presumed to reside in the language they choose to use in their agreement." *Id.* (quoting *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 313 (1996)). "The Court must look to the plain language of the contract, and only go beyond the plain language of the agreement to determine the rights and obligations of the parties if it is ambiguous." *Airlink Communications, Inc. v. Owl Wireless, LLC*, No. 3:10 CV 2296, 2011 WL 4376123, at *2 (N.D. Ohio Sept. 20, 2011) (internal citations omitted). "Contractual language is ambiguous 'only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations.'" *Savedoff*, 524 F.3d at 763 (quoting *Covington v. Lucia*, 784 N.E.2d 186, 190 (Ohio Ct. App. 10th Dist. 2003)). "If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined." *JBlanco Enterprises v. Soprema Roofing and Waterproofing, Inc.*, No. 1:13–cv–2831, 2016 WL 6600423, at *4 (N.D. Ohio Nov. 8, 2016) (quoting *Inland Refuse Transfer Co. v. Browning–Ferris Indus. of Ohio*, 15 Ohio St.3d 321, 322 (1984)).

This case centers on the interpretation of an early termination clause in the Lease and whether Riser had the right to terminate the Lease after the demolition of the Target building. Great-West

---

[4] The Court applies Ohio law, as the parties do not dispute that the Lease is governed by Ohio law. *See, e.g.*, *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008).

asserts that the conditions for early termination enumerated in Section 15.6 of the Lease were not satisfied, and Riser's termination and failure to continue paying rent under the Lease was therefore improper. (*See* Doc. No. 50.) Conversely, Riser contends it had the right to terminate the Lease under Section 15.6 and timely exercised that right. (*See* Doc. No. 45.)[5]

> Section 15.6 provides, in relevant part, the following:

> Notwithstanding anything to the contrary in this Lease contained, if Tenant's Building or the Shopping Center buildings are damaged or destroyed (a) during the last three (3) years of the then existent term of this Lease to an extent equal to at least thirty percent (30%) of their replacement cost during the third last year . . . then either Landlord or Tenant may terminate this Lease as of the date of the occurrence of such damage or destruction by notice to the other party within sixty (60) days after the occurrence of such damage or destruction . . . .

(Doc. No. 46-1 at 36.) Under this provision, Riser was entitled to terminate the lease if (1) the Target building was part of the "Shopping Center" as defined in the Lease; (2) Landlord's demolition of the Target building "damaged or destroyed" a Shopping Center building; (3) the damage or destruction occurred within the last three years of the Lease; (4) the damage or destruction satisfied the 30 percent threshold; and (5) Riser's notice of termination was provided within 60 days of the damage or destruction. The parties do not dispute that any damage or destruction of the Target building occurred within the last three years of the Lease, as the lightning strikes occurred in May 2015, the demolition occurred in July 2015, and the Lease expired on March 31, 2018. (*See* Doc. Nos. 46-8, 46-27.) The Court analyzes each of the other issues below.

---

[5] Great-West asserts that Riser's contention that it properly terminated the Lease early is an affirmative defense. (Doc. No. 57 at 7-8.) Riser contends its right to terminate the Lease early shows that Riser did not breach the Lease in the first place, but that even if Riser's termination is considered an affirmative defense, it has exceeded its burden of proof. (Doc. No. 58 at 1.) The Court agrees with Riser that it is entitled to summary judgment regardless of whether its termination of the Lease is considered an affirmative defense.

### a. Whether the Target Building Was a "Shopping Center" Building

The early termination provision in Section 15.6 is triggered only "if Tenant's Building or the Shopping Center buildings are damaged or destroyed." (Doc. No. 46-1 at 36.) The building leased by Riser was not damaged at all by either the lightning strikes or the demolition of the Target building. As such, the Court must determine whether the Target building was part of the Shopping Center, as that term is defined in the Lease. Riser argues that the plain language of the Lease unambiguously defines the Shopping Center to include the Target building and that this is confirmed by Landlord's course of dealing and Great-West's own admissions. (Doc. No. 45 at 12-13.) In contrast, Great-West contends that missing exhibits from the Lease create an ambiguity in the definition of the Shopping Center, and testimony from Landlord's representative, George Goudreau, Jr. ("Goudreau"), should thus be considered. (Doc. No. 50 at 10-12.) Great-West asserts Goudreau's testimony demonstrates that the Target building was not part of the Shopping Center. (*Id.*) The Court concludes that the Lease unambiguously defines the Shopping Center to include the Target building.

The Lease provides that "[t]he Land and the buildings and improvements now or hereafter located on the Land are known as the Meadowbrook Market Square II Shopping Center (the 'Shopping Center')." (Doc. No. 46-1 at 1.) Thus, under the Lease, the Shopping Center is defined as "[t]he Land and the buildings and improvements now or hereafter located on the Land." (*Id.*) In turn, the Lease defines the Land as "a parcel of land located at Rockside and Northfield Roads, as shown on the Site Plan, described on the attached Exhibit B." (*Id.*) Lease Exhibit B, which is labeled "Legal Description of Shopping Center," provides a metes and bounds description of property. (*Id.* at Ex. B.) Riser's expert, Daniel Neff ("Neff"), translated this description onto a survey that shows

that the Target building was located within the area defined by Exhibit B.  (Doc. No. 46-2.)[6]  As such, the Target building that was demolished was located on the Land, and the Shopping Center includes "[t]he Land and the buildings and improvements now or hereafter located on the Land."  (Doc. No. 46-1 at 1.)  As a result, the Lease unambiguously provides that the Target building was part of the Shopping Center.

Other provisions of the Lease confirm this conclusion.  The Lease provides that "Landlord intends to develop the Shopping Center in three (3) separate phases which are respectively designated as (a) the 'Phase I Shopping Center Development Area' (including 'Proposed Future Out Lot Area East' and sometimes hereinafter referred to as 'Phase I', (b) the 'Phase II Proposed Future Development Area' and sometimes hereinafter referred to as 'Phase II' and (c) the 'Phase III Proposed Future Out Lot Development Area' and sometimes hereinafter referred to as 'Phase III' and which are respectively identified as such on the Site Plan."  (*Id.*)  The Site Plan referred to is identified by the Lease as Exhibit A.  (*Id.*)  Attached to the Lease as Exhibits A, A-1, A-2, A-3 and A-4 are legal descriptions of property.  Exhibit A provides the same legal property description as Exhibit B. (*Id.* at Exs. A, B.)  Exhibits A-1, A-2, and A-3 are labeled Phase I, Phase II, and Phase III, respectively.  (*Id.* at Exs. A-1, A-2, A-3.)  Neff also translated these legal descriptions, and the translation shows that the Target building was located in Phase II, which is a section of the larger area defined in both Exhibits A and B.  (Doc. No. 46-2.)  Thus, the Site Plan or Exhibit A also

---

[6] Great-West contends that Riser's reliance on Neff's expert report to interpret the Lease is an admission that the Lease contains an ambiguity as to the definition of the Shopping Center.  (Doc. No. 57 at 10-11.)  The Court disagrees.  Neff simply translated a legal property description contained in the Lease onto a land survey.  Riser does not rely on Neff's report to interpret the meaning of the language of the Lease in a way that would indicate an ambiguity exists.  Nor does Great-West contend that Neff's translation is inaccurate.

unambiguously reveals that the Target building was part of the three phases in which the Landlord "intend[ed] to develop the Shopping Center." (Doc. No. 46-1 at 1.)[7]

Despite the unambiguous language of the Lease, Great-West argues that there is an ambiguity with respect to the definition of the Shopping Center because the Lease is missing exhibits. (Doc. No. 50 at 10-12; Doc. No. 57 at 10-12.) The Lease provides that "[t]he Shopping Center is shown on the Site Plan and on the survey dated August 6, 1992 attached as Exhibit B-1." (Doc. No. 46-1 at 1.) However, there is no Exhibit B-1 to the Lease. Great-West also asserts that the Site Plan, defined as Exhibit A by the Lease, was never attached to the Lease. (Doc. No. 50 at 11.) The Lease does contain an Exhibit A, as described above, but Great-West appears to be referring to a visual depiction, not a legal description of the property, that should have been attached. (*See* Doc. No. 50-1 at 74.) Regardless, the fact that these exhibits may be missing does not create an ambiguity in the Lease, as the definitions and legal descriptions of property that are present within the Lease unambiguously demonstrate that the Target building was part of the Shopping Center.

Great-West also points to Goudreau's testimony in which he indicates that the intent of the parties was not to include the property on which the Target was located as part of the Shopping Center. (Doc. No. 50-1 at 10-13.) However, this is insufficient to create an ambiguity in otherwise unambiguous contractual language, especially given that Goudreau admitted that he had nothing to do with signing the Lease and did not know the intent of the parties at the time. (Doc. No. 59-1 at 17:17, 18:15-19:11.) Moreover, "[u]nder Ohio law, the parol evidence rule excludes from consideration evidence as to other oral promises or discussions occurring prior to or contemporaneous

---

[7] Because the Court finds the language of the Lease to be unambiguous, it need not rely on the additional evidence submitted by Riser regarding Landlord's course of dealing and the admissions by Great-West's representative. (*See* Doc. No. 45 at 12-13.)

with a written contract which attempt to vary or contradict terms of the written contract." *Columbia Gas Transmission Corp. v. Ogle*, 51 F. Supp. 2d 866, 871 (S.D. Ohio 1997).

Accordingly, the Court finds that the Target building was part of the Shopping Center as defined by the Lease.

### b. Whether Great-West's Razing of the Target Building "Damaged or Destroyed" a Shopping Center Building

Next, the Court must determine whether Landlord's demolition of the Target building "damaged or destroyed" a Shopping Center building as those terms are used in Section 15.6. Riser argues that the demolition of a building falls within the plain meaning of destruction, while Great-West asserts that reading the Lease as a whole, it is clear that damage or destruction refers to unintentional casualties. (Doc. No. 45 at 13-16; Doc. No. 50 at 14-19.)[8] The Court agrees with Riser that the demolition of the Target building qualifies as the destruction of a Shopping Center building under the Lease.

According to the Supreme Court of Ohio, "common words appearing in a written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument." *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 245-46 (1978). "To ascertain the common meanings of terms or phrases not defined in the language of contracts, Ohio courts routinely turn to dictionaries." *Textileather Corp. v. GenCorp Inc.*, 697 F.3d 378, 382 (6th Cir. 2012). At the same time, "[a] writing,

---

[8] In support of its interpretation, Riser also cites a report by its expert, Andrew Shedlin, concluding that the demolition of the Target building was destruction under the Lease. (Doc. No. 45 at 14.) Great-West attacks this evidence as an improper legal conclusion by an expert. (Doc. No. 57 at 13-14.) Because the Court finds the language of the Lease unambiguous with respect to the meaning of damage or destruction in Section 15.6, the Court need not consider this evidence or whether it is an appropriate conclusion for an expert.

or writings executed as part of the same transaction, will be read as a whole, and the intent of each part will be gathered from a consideration of the whole." *Id.* (quoting *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 361 (1997)). Indeed, "when possible, a court's construction of a contract should attempt to harmonize all the provisions of the document rather than to produce conflict in them." *Love v. Beck Energy Corp.*, No. 14 NO 415, 2015 WL 1453338, at *3 (Ohio Ct. App. 7th Dist. Mar. 31, 2015).

In this case, Section 15.6 applies only if the Target was "damaged or destroyed." (*See* Doc. No. 46-1 at 36.) Those terms are not defined within the Lease. As such, they must be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face of the Lease. The plain meaning of "destroy" clearly includes the demolition or razing of a building. *See, e.g.*, Oxford English Dictionary Second Edition (1989) ("To pull down or undo (that which has been built); to demolish, raze to the ground."); Merriam-Webster (2020) ("to ruin the structure, organic existence, or condition of"); Cambridge Dictionary (2020) ("to damage something so badly that it cannot be used"). Indeed, none of the definitions cited by the parties exclude intentional acts of destruction. Further, although interpreting a statute instead of a contract, at least one Ohio court has treated the term "destroyed" as including the intentional demolition of a building. *Spangel v. Ohio Contracting Co.*, No. 73 C. A. 26, 1973 Ohio App. LEXIS 1947, at *3 (Ohio Ct. App. 7th Dist. Sept. 26, 1973) (holding lessee was not liable for rent after a third party demolished the leased building because of a statute providing that a "lessee of a building which, without fault or neglect on his part, is *destroyed* or so injured as to be unfit for occupancy, is not liable to pay rent") (emphasis added). As such, the Court finds that the demolition of the Target building falls within the plain meaning of the phrase "damaged or destroyed" as used in Section 15.6.

Great-West's arguments that this plain meaning should not be applied based on a reading of the Lease as a whole are unavailing. First, Great-West cites to Section 15.1, which contains the first mention of damage or destruction in the Lease and provides:

> If all or any part of the Shopping Center buildings (other than Tenant's Building) or the Common Areas is *damaged or destroyed by fire or other cause*, Landlord shall commence promptly, and with reasonable dispatch continue, to restore same to substantially the same condition as existed immediately preceding the *damage or destruction*; provided, however, Landlord may raise [sic] any damaged building and elect not to rebuild same.

(Doc. No. 46-1 at 34 (emphasis added).) Great-West argues that because the first mention of damage or destruction is limited to that caused "by fire or other cause," and later in the same paragraph the phrase is shortened to just "damage or destruction," the two phrases cannot be interpreted to have different meanings. (Doc. No. 50 at 16-17.) According to Great-West, the use of the phrase "damage or destruction" in the rest of Article 15—whether used in conjunction with the phrase "fire or other cause" or by itself—should therefore be construed as being limited to damage or destruction caused by unintentional accidents. (*Id.*; *see also* Doc. No. 57 at 13.)

This argument is misguided. Within Section 15.1, the shortened phrase "damage or destruction" is simply referring to the damage or destruction that Section 15.1 specified must be caused by fire or other cause in the first clause of the section. As such, there is no inconsistency within Section 15.1. The same is true for Sections 15.2 to 15.5. Like Section 15.1, each of these sections specifically require an unintentional casualty or incorporate that requirement from another section. For example, Section 15.2 describes certain rights and responsibilities of the parties when the "Tenant's building is damaged or destroyed by fire or other cause." (Doc. No. 46-1 at 34.) Later in Section 15.2, the phrase "damage or destruction" is used by itself, again in reference to what was specifically required to be caused by fire or other cause in the opening clause of the section. (*See id.*)

15

Similarly, Section 15.5 addresses what happens to rent if "Tenant's Building is damaged or destroyed in whole or in part by fire or other cause, and if this Lease is not terminated," and then continues to refer to "such damage or destruction" throughout the rest of the section. (*Id.* at 36.)

But Section 15.6 is different, as it specifically omits the phrase "by fire or other cause" in its opening sentence: "Notwithstanding anything to the contrary in this Lease contained, if Tenant's Building or the Shopping Center buildings are *damaged or destroyed* (a) during the last three (3) years of the then existent term of this Lease . . . ." (*Id.* (emphasis added).) This is significant because the parties to the Lease clearly knew how to require an unintentional casualty, as evidenced by their use of the phrase "by fire or other cause" in other sections of the Lease. The omission of that phrase in Section 15.6 demonstrates that Section 15.6 is not limited to unintentional casualties. *See, e.g.*, *Nour v. Shawar*, Nos. 13AP–1070, 13AP–1076, 2014 WL 3058296, at *2-3 (Ohio Ct. App. 10th Dist. July 8, 2014). In fact, nowhere in Section 15.6 is there a requirement for an unintentional casualty, and Section 15.6 does not incorporate other sections that refer to damage or destruction due to an unintentional casualty by use of the phrase "by fire or other cause." Thus, the Court finds Great-West's first argument unpersuasive.

Next, Great-West argues that if "destruction" included the intentional razing of a building, Landlord's option in Section 15.1 to "ra[ze] any damaged building and elect not to rebuild same" would be meaningless. (Doc. No. 50 at 18.) The Court disagrees. Even if destruction is interpreted to include the intentional razing of a building, Landlord still had a very real option to demolish the building pursuant to Section 15.1 for the entirety of the Lease. To illustrate, if the Target building was damaged at any point before Section 15.6 came into effect (i.e., before the last three years of the Lease), Landlord could have demolished the Target building without triggering Riser's termination

16

rights.  (Doc. No. 46-1 at 34, 36.)  After the term of the Lease entered its final three years, Landlord could still raze the Target building pursuant to Section 15.1.  However, doing so would potentially give Riser the option to terminate the Lease under Section 15.6.  (*Id.*)  Landlord's option to raze the building under Section 15.1 is clearly not surplusage under this interpretation.

Moreover, the plain language of Section 15.6 overrides any permission provided in Section 15.1 that could be viewed as contradicting the terms of Section 15.6.  The opening clause of Section 15.6 provides:  "*Notwithstanding anything to the contrary in this Lease contained*, if Tenant's Building or the Shopping Center buildings are damaged or destroyed . . . ."  (*Id.* at 36 (emphasis added).)  Ohio courts have defined "notwithstanding" to mean "without prevention or obstruction from or by; in spite of."  *E.g.*, *Agostinelli v. DeBartolo Realty Corp.*, No. 97 CA 227, 1999 WL 669518, at *5 (Ohio Ct. App. 7th Dist. Aug. 18, 1999).  Accordingly, the application of Section 15.6 of the Lease is not limited or constrained by the permissioned destruction in Section 15.1.  Nor does the notwithstanding language in Section 15.6 apply solely to negate an alleged discrepancy with Section 15.4, as Great-West contends.  (Doc. No. 60 at 1-3.)  The plain language of Section 15.6 provides that the rights are "[n]otwithstanding anything to the contrary in this *Lease contained*"— unambiguously referring to the entire Lease.  Additionally, the Court sees no discrepancy or contradiction between Sections 15.4 and 15.6, as both sections simply provide the right to terminate the Lease in certain circumstances.  (*See* Doc. No. 46-1 at 35-36.)

Finally, Great-West contends that Riser's interpretation of Section 15.6 would lead to absurd results.  First, Great-West argues Riser's interpretation would mean that Landlord's intentional renovation of the Shopping Center could be construed as damage or destruction and therefore trigger Riser's early termination rights.  (Doc. No. 50 at 18.)  But as Riser correctly points out, Landlord

could still renovate any portion of the Shopping Center without triggering the termination provision up until the final three years of the Lease. In addition, in the final three years of the Lease, it is not an absurd outcome to trigger early termination rights if over 30 percent of the Shopping Center is being renovated such that it could be considered damaged or destroyed. Indeed, the ability to terminate the Lease at that point provides real protection, as a dramatically renovated Shopping Center might affect a tenant's expenses, such as carrying costs, taxes, insurance, and utilities.

Second, Great-West asserts that if "damaged" and "razed" had synonymous meanings, Landlord would be obligated to purchase an all-risk policy of property insurance pursuant to Section 16.1 of the Lease, which under Ohio law would be void since the intentional act of razing is not insurable. (Doc. No. 50 at 18.) However, Section 16.1 of the Lease requires "the broadest standard 'all risk' policy of property insurance . . . *against damage by fire and those risks included in the so-called 'extended coverage', vandalism, malicious mischief, sprinkler leakage, collapse* . . . ." (Doc. No. 46-1 at 37 (emphasis added).) Thus, the use of "damage" in Section 16.1 is specifically limited in a way that would exclude intentional demolition.

Third, Great-West contends that if "razing" is synonymous with "destroyed" or "destruction," then Section 15.2(a) would not make sense. (Doc. No. 60 at 5.) However, it does not appear that "razing" is synonymous with "destroyed" or "destruction" as those terms are used in Section 15.2(a) because Section 15.2(a) applies only when the tenant's building is "damaged or destroyed by fire or other cause," thereby excluding intentional razing. (Doc. No. 46-1 at 34.)

Finally, Great-West asserts Riser's interpretation would allow Landlord to unilaterally create a destruction by razing a building in order to terminate the Lease. (Doc. No. 60 at 5-6.) But the Lease provides for this type of scenario, as the Tenant has the ability to exercise extension periods

18

available as of the date of the damage or destruction.[9]  Riser in fact had the option to exercise five successive five-year extensions under the Lease if Landlord had exercised its termination rights.  (*See* Doc. No. 46-1 at 4.)

Accordingly, the Court finds that Landlord's demolition of the Target building "damaged or destroyed" a Shopping Center building as provided for in Section 15.6.

### c.  Whether the 30 Percent Threshold Was Satisfied

Section 15.6 of the Lease allows the tenant to terminate the Lease when "Shopping Center buildings are damaged or destroyed (a) during the last three (3) years of the then existent term of this Lease *to an extent equal to at least thirty percent (30%) of their replacement cost during the third last year . . . .*"  (*Id.* at 36 (emphasis added).)  Riser asserts the 30 percent threshold was satisfied because both parties' experts agree that the replacement cost of the Target exceeded 30 percent of the costs of replacement for the Shopping Center.  (Doc. No. 45 at 16-19.)  Great-West contends the 30 percent threshold was not satisfied because the appropriate measure to compare to the replacement cost of the Shopping Center is not the replacement cost of the Target that was destroyed, but the costs of repairing the damage from the lightning strikes and/or the costs of the demolition.  (Doc. No. 57 at 17.)  The Court finds no support for Great-West's argument, and thus concludes that the 30 percent threshold in Section 15.6 has been satisfied.

Section 15.6 applies when the Shopping Center buildings are "damaged or destroyed . . . to an extent equal to at least thirty percent (30%) of their replacement cost."  (Doc. No. 46-1 at 36.)

---

[9] (*See* Doc. No. 46-1 at 36 ("[I]f within thirty (30) days after receipt of such notice of termination from Landlord, Tenant exercises any Extension Period option available to it as of the date of such damage or destruction, then this Lease shall continue in full force and effect notwithstanding the fact that a notice of termination may have been given by Landlord prior to the exercise of such option, and Landlord shall be obligated to repair, rebuild and restore to the extent provided for in this Lease.").)

Thus, the proper comparison is the replacement cost of the damaged or destroyed Shopping Center buildings against the replacement cost of all of the Shopping Center buildings. The cost incurred to damage or to destroy the buildings is not identified as being relevant by Section 15.6, and Great-West's contention that the cost of the demolition should be included in the comparison to the replacement cost of the Shopping Center finds no support in the Lease's language. Indeed, Great-West's interpretation would lead to absurd results, as pursuant to its interpretation, the costs of repairing the lightning strikes and of razing the Target building—which constitutes over 40 percent of the entire square footage of the Shopping Center—would amount to only 2.62 percent of the replacement cost of the Shopping Center. (*See* Doc. No. 46-28 at 5-6.) Nor is it appropriate to solely consider the costs of repairing the damage caused by the lightning strikes in the comparison, as Landlord subsequently demolished the entire Target building, which was the destruction that triggered the application of Section 15.6, as discussed above.

Accordingly, under Section 15.6, the Court must determine whether the cost of replacing the Target building was more than 30 percent of replacing the entire Shopping Center. Riser's expert, Arne Goldman ("Goldman"), used two common estimation methods, and found that the Target building's replacement cost exceeded 40 percent of the replacement cost of the Shopping Center under both methods. (Doc. No. 46-29 at 44.) Great-West's expert, Lyn Godsey ("Godsey"), used only one cost estimation method, but came to the exact same estimates with respect to the replacement cost of the Target building and the replacement cost of the Shopping Center as Goldman did when using the same method. (*See* Doc. No. 46-28 at 5.) As a result, there is no factual dispute that the Target building's replacement cost exceeded 30 percent of the replacement cost for the Shopping

Center. Under the proper application of Section 15.6, the Court thus finds that the 30 percent threshold required to trigger Riser's early termination rights was satisfied.

### d. Whether Riser's Notice of Termination Was Timely

The final condition that must have been satisfied in order for Riser's early termination of the Lease to have been proper is timely notice to Landlord. Riser contends it provided timely notice within 60 days of the demolition. (Doc. No. 45 at 19-20.) Conversely, Great-West asserts that Riser failed to provide notice of its termination within 60 days of the lightning strikes, and the notice was thus untimely. (Doc. No. 50 at 10.) The Court finds that Riser's notice was timely.

Section 15.6 provides that either party may terminate the Lease "by notice to the other party within sixty (60) days after the occurrence of such damage or destruction." (Doc. No. 46-1 at 36.) While the parties do not dispute that the lightning damaged the Target building, the triggering destruction in this case was the demolition of the Target building. As such, to provide timely notice, Riser must have alerted Landlord of its termination of the Lease within 60 days of the demolition. Great-West has not argued that Riser's termination would be untimely if measured from the demolition. Indeed, Great-West admits that the demolition was not completed until the end of July 2015. (Doc. No. 50 at 2.) It is also undisputed that Riser provided notice of its termination of the lease on September 16, 2015. (Doc. No. 46-19.) Consequently, Riser provided notice within 60 days of the demolition, and its notice was therefore timely under Section 15.6.

Accordingly, the Court has determined that there are no genuine issues of material fact with regard to whether all of the conditions necessary for Riser to properly terminate the Lease pursuant

to Section 15.6 have been satisfied.[10]  Riser's termination of the Lease in September 2015 was proper, and it did not breach the Lease by refusing to pay rent after its termination.

## IV.    Conclusion

For the reasons set forth above, Riser's Motion for Summary Judgment (Doc. No. 44) is GRANTED, and Great-West's Motion for Summary Judgment (Doc. No. 49) is DENIED.

**IT IS SO ORDERED.**


*s/Pamela A. Barker*
PAMELA A. BARKER
Date:  March 31, 2020                                    U. S. DISTRICT JUDGE

---

[10] The Court notes that Great-West has also asserted generally that Riser's continued payment of insurance and utilities is inconsistent with its contention that it had properly terminated the Lease.  (Doc. No. 50 at 3-4.)  The Court finds this fact inconsequential in light of the unambiguous language of the Lease and Riser's indication that it continued paying such costs merely as a precaution.